OPINION OF THE COURT
Michael D. Stallman, J.
This CPLR article 78 proceeding challenges New York City’s adoption of a budget provision that would withhold the City’s appropriation from the City University of New York (CUNY) community colleges unless the CUNY Board of Trustees requires remedial students to pass specified examinations as prerequisites for the regular curriculum.[1]
*400 FACTS
In June 1999, respondents City Council and Mayor adopted the 1999-2000 expense budget, which appropriated $88.2 million to the six CUNY community colleges. The City’s expense budget included the following provision:
“No funds provided pursuant to this appropriation shall be made available to the City University of New York (CUNY) unless the Board of Trustees of CUNY, by September 30, 1999, adopts a resolution that sets forth and establishes the following policies to be implemented during the 1999-00 academic year and delivers a copy of such resolution to the Mayor and the City Council:
“All community colleges shall use an objective test, reflecting nationally based standards, to determine when students who have been placed in remediation programs successfully achieve college readiness and are prepared to exit from remediation.” (City of New York Adopted Budget Fiscal Year 2000, City University Units of Appropriation, at 69E-70E.)
The CUNY Board is scheduled to meet on September 27, 1999 to consider the City’s requirement. In August 1999, the State of New York enacted its budget, which set the CUNY community college operating budget at $354.1 million. The State budget allocated $123.4 million (34.8%) from State funds and provided that the City would supply $88.2 million (24.9%). Students, via tuition and fees, would provide the balance, assumed to aggregate $142.5 million (40.2%).
Petitioner Diana Perez, a student at Bronx Community College, must enroll in a remedial mathematics course this academic year. Petitioner contends Education Law § 6304 (1) requires the City to pay a minimum of $79.4 million unconditionally. Petitioner maintains that she will be irreparably harmed if the CUNY Board adopts a new examination requirement after her classes have begun, because professors would not have had an opportunity to study the new requirement and integrate it into the curriculum, and because withholding the City’s contribution would affect the University and require increased tuition.
Petitioner seeks[2] (1) a judgment declaring the term and condition enacted as part of the City budget in violation of *401 State law; (2) a writ of mandamus compelling the City to provide no less than $79.4 million to CUNY for the 1999-2000 fiscal year; and (3) a judgment enjoining the City from withholding or placing any conditions on the allocation of the $79.4 million. In the alternative, if the City fails to provide $79.4 million, petitioner seeks to enjoin CUNY from charging tuition aggregating in excess of one third of the community college operating budget.
The City contends that petitioner lacks standing. The City asserts that the CUNY Board has considered for some time requiring a standardized examination, and that it would be in the best interest of the student body. Furthermore, the City contends that petitioner is not entitled to a preliminary injunction.[3]
I.
Standing “is a threshold determination, resting in part on policy considerations, that a person should be allowed access to the courts to adjudicate the merits of a particular dispute that satisfies the other justiciability criteria”. (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 769 [1991].) To establish standing, “[a] petitioner need only show that the administrative action will in fact have a harmful effect on the petitioner and that the interest asserted is arguably within the zone of interest to be protected by the statute.” (Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 9 [1975]; see also, Society of Plastics Indus. v County of Suffolk, supra, 77 NY2d, at 773.) Under the “zone of interest” test, the court examines whether the petitioner’s interest is within the concerns the Legislature sought to protect or advance by its legislation. (Matter of East Thirteenth St. Community Assn. v New York State Urban Dev. Corp., 84 NY2d 287, 295-296 [1994].)
The City argues that petitioner cannot establish standing, as she will not be required to take the proposed examination. The City argues that she cannot establish an injury in fact because she is not required to take any further remedial mathematics courses pursuant to CUNY-wide standards.
*402 The City’s view is unrealistically narrow. Petitioner’s education at CUNY will be affected by whether the City appropriation is made available to the University. The threatened loss of a quarter of CUNY’s operating budget would drastically affect CUNY’s over-all operation during this academic year. It is inevitable that without that City funding, all students, including petitioner, will feel the impact on the CUNY educational program. Moreover, it is likely that future tuition levels would be affected by a substantial withdrawal of funding. Thus, petitioner has standing not merely because she may be required to sit for an examination, ■ or retake a course,[4] but rather, because of the inexorable consequences of the challenged budget provision on her, the entire University and the State’s mandatory funding plan. (See, Matter of Camilo v Giuliani, 163 Misc 2d 1020 [Sup Ct, NY County 1995] [CUNY students affected by budget allocation had standing to seek mandamus of nondiscretionary act].)
II.
In 1979, the State Legislature reorganized the existing public senior and community colleges of the City University as an independent corporation known as the “City University of New York.” (L 1979, ch 305, § 1.) CUNY, as a legal entity, is a creation of the State. (See, Brooks v Board of Higher Educ., 113 Misc 2d 494, 496 [Sup Ct, NY County 1982].)
The CUNY reorganization had two goals. First, the State sought to relieve the City, in the midst of a financial crisis, from the burden of funding CUNY on its own. (See, Governor’s Mem approving L 1979, ohs 305, 306, 1979 McKinney’s Session Laws of NY, at 1787.) Second, the State envisioned CUNY as an independent system of higher education despite State financial assistance. In exchange for massive funding, the City relinquished its control of the University, which it had exercised through the semiautonomous former Board of Higher Education. To assure CUNY’s autonomy, the Legislature established an independent Board of Trustees. (See, Education Law § 6201 [2], [3].) The Governor recognized that CUNY’s survival as a State-assisted, independent institution required continued City financial support for “a first-rate community college system.” (See, Governor’s Mem, op. cit., at 1788.)
*403 The State Legislature explicitly vested the CUNY Board with independent powers to “govern and administer the city university.” (Education Law § 6204 [1].) The Legislature granted the CUNY Board the power to “establish and conduct courses and curricula” and “prescribe conditions of student admission, attendance and discharge”. (Education Law § 6206 [7] [a]; see also, Education Law § 6204 [1] [“The control of the educational work of the city university shall rest solely in the board of trustees which shall govern and administer all educational units of the city university”] [emphasis added].) Thus, to promote the educational mission envisioned by the Legislature, the CUNY Board would not only be independent, but would also have exclusive authority to determine all academic requirements for CUNY students.
III.
The Legislature mandated that the State, the City (the local sponsor) and the students, via tuition and fees, share financing of CUNY community college operating costs; as a general rule, each would bear one third. (Education Law § 6304 [1] [a], [c], [d].) If a community college maintains a “program of full opportunity,” the State and City percentages are altered.[5]
[6] Under a full opportunity program, the State assumes 40% the City must pay 26.7% and the students provide the balance of 33.3%. (Education Law § 6304 [1] [a], [c].)
In recent years, the Legislature has further modified the funding scheme through an annual enactment known as a “Maintenance of Effort Law.” The State budget enacted in August 1999 includes such a provision: “Notwithstanding any other law, rule, or regulation to the contrary * * * pursuant to standards and regulations of the state university trustees and the city university trustees for the college fiscal year 1999-2000, community colleges may increase tuition and fees above that allowable under current education law if such standards and regulations require that in order to exceed the tuition limit otherwise set forth in the education law, local sponsor contributions either in the aggregate or for each fulltime equivalent student shall be no less than the comparable amounts for *404 the previous community college fiscal year.” (City University of New York, State Operations and Aid to Localities, Operating Assistance, L 1999, ch 53.) The Maintenance of Effort Law waives the full opportunity funding formula, thereby permitting the City and State to pay smaller proportions, provided that the City matches or exceeds the dollar amount of aid it provided the previous fiscal year. Pursuant to the 1999 Maintenance of Effort Law, the provisions of Education Law § 6304 (1) (a) and (c) requiring the State and the City to pay 40% and 26.7% of the operating budget are waived for the 1999-2000 fiscal year, only if the City matches its 1998-1999 appropriation of $79.4 million.
The State legislative scheme governing CUNY community college funding effectively mandates the City to appropriate annually the sponsor’s share of the sum fixed by the applicable statutory funding formula. The City’s obligation to pay the State-determined amount is ministerial, not discretionary.
IV.
Education Law § 6304 (6), applicable to the City, provides in relevant part: “The local legislative body or board, or other appropriate governing agency, other than a community college regional board of trustees, shall provide the local sponsor’s share of the community college operating and capital costs in conformance with such sponsor’s annual budgetary appropriation, and shall direct that payment of all appropriations for maintenance of the college be made to the board of trustees of the college for expenditure by the board, subject to the terms and conditions of such appropriations appearing in such budget and to such regulations regarding the custody, deposit, audit and payment thereof as such local legislative body or board, or other appropriate governing agency, may deem proper to carry out the terms of the budget.” The court must determine whether the City’s superimposed exit examination requirement is a permissible “term and condition” under the Education Law. The parties have not cited, and research has not revealed, case law defining a permissible “term and condition” under section 6304 (6). This provision must be read in harmony with other relevant provisions of the Education Law (see, part II, supra) to promote consistency with the over-ill State purpose of maintaining the educational independence and fiscal stability of the City University through shared funding.
Courts have consistently interpreted the Legislature’s grant of power over academic requirements and university govern- *405 anee to the CUNY Board as exclusive. (See, Matter of Mendez v Reynolds, 248 AD2d 62, 64 [1st Dept 1998] [“The City University Board of Trustees possesses the sole and exclusive statutory authority to impose graduation and course requirements for all CUNY colleges”] [emphasis added]; Matter of Polishook v City Univ., 234 AD2d 165, 166-167 [1st Dept 1996] [CUNY Board has exclusive authority to implement long-range planning resolution as part of its power to “ ‘govern( ) and administer( )’ ” the City University] [quoting Education Law § 6204 (1)].) CUNY is a State-created independent entity, not an agency or subdivision of City government. Because its Board exercises powers vested by the State Legislature, the City cannot alter or reduce those powers, or restrict their exercise, by legislation or otherwise. Accordingly, the City cannot mandate examination requirements or curricular prerequisites, or require the CUNY Board to do so.
This conclusion is consistent with the sound public policy evinced by statute: Educators should determine academic standards. An independent Board of Trustees, unique to CUNY, helps to insulate the University from the elected leaders who control its budget. It would be contrary to the Legislature’s intent to permit the City to use the budget process to do what it may not do by local law. A “term and condition” of a budget appropriation is impermissible if it legislates educational policy or restricts the CUNY Board’s exclusive powers.
This proceeding does not seek to enjoin the CUNY Board from adopting an exit examination requirement. Neither side disputes that the CUNY Board is so empowered. Precisely because the CUNY Board has that power, it is privileged to choose when and whether to exercise — a power that the challenged budget condition impermissibly negates. As a CUNY student, petitioner is entitled to have the CUNY Board make academic decisions free from compulsion.
Under the challenged City budget condition, because only the CUNY Board would vote on the proposal, technically the Board would remain the entity imposing the new academic requirement. However, it is implausible to suggest that the CUNY trustees’ votes could be truly independent if the result could cut the University budget by one fourth. In a direct and practical way, the City’s action interferes with the CUNY Board’s exclusive power to determine educational standards. *406 The City may advocate; it may not substitute its judgment for that of the trustees by threatening to withhold funding.[6]
V.
Remaining for determination is the amount that the City must legally provide CUNY for the community colleges this year. Petitioner asserts that the City must pay at least $79.4 million under the Maintenance of Effort Law. The City alleges that it need not maintain last year’s funding level because the CUNY Board has not requested an increase in tuition this year.
The Maintenance of Effort Law is an enabling act. It permits the City to contribute a lower amount to the operating budget than required by the otherwise applicable formula, if the City’s contribution matches or exceeds the dollar amount provided by the City for the prior fiscal year.[7] (See, part III, supra.) The Maintenance of Effort Law then allows tuition and fees to exceed one third of the community college budget, the maximum otherwise permitted. The City incorrectly assumes that the Maintenance of Effort Law is inapplicable because no increase in tuition and fees is contemplated for the 1999-2000 fiscal year over last year’s rates. Rather, the Maintenance of Effort Law formula is applicable and binds the City to maintain last year’s contribution because the tuition and fees exceed one third of the current CUNY operating budget. It is undisputed that under last year’s Maintenance of Effort Law, tuition and fees for the 1998-1999 fiscal year also exceeded one third of the operating budget. The City was then permitted to contribute less than 26.7% to the 1998-1999 operating budget only because it maintained a level equal to its previous contribution. It is thus immaterial that CUNY has not sought a tuition increase this year over last year’s rates.
Were the City not to fund the community colleges at a dollar amount at least matching the 1998-1999 level, the purpose of the Maintenance of Effort Law would be vitiated. The Maintenance of Effort Law permitted the City to reduce its State- *407 mandated share each year. Given the expectation that the City would pay, at a minimum, a known, specified sum, the State computed and appropriated its share, and permitted CUNY to increase tuition and fees to make up the balance required to meet the total budget. Therefore, given the current level of tuition and fees authorized under the Maintenance of Effort Law, computed in reliance on the City’s commitment, the City must maintain its funding, at a minimum, at last year’s level.
If it were not to make its contribution to the community colleges pursuant to the Maintenance of Effort Law, the City would still be required to contribute an amount pursuant to the full opportunity formula. (Education Law § 6304 [1] [c]; Matter of Apollon v Giuliani, 168 Misc 2d 363, 366 [Sup Ct, NY County 1995].) The full opportunity formula would require that the City pay its full share of 26.7% pursuant to Education Law § 6304 (1) (c). (See, Matter of Camilo v Giuliani, 163 Misc 2d 1020, 1025, supra.) Under that formula, the City’s share would be 26.7% of the $354.1 million operating budget set by the State, approximately $94.5 million.
Petitioner’s request for a judgment enjoining the City from placing any conditions on any part of the $79.4 million allocation is denied. Education Law § 6304 (6) specifically provides that the City has the authority to appropriate its share of money subject to certain terms and conditions. However, the City may not attach a term or condition that interferes with powers vested exclusively in the CUNY Board, such as the condition challenged here.
CONCLUSION
City funding of the community colleges at a minimum of $79.4 million this fiscal year is a duty enjoined by State law. Because only the CUNY Board of Trustees has the power to prescribe academic standards, including examination requirements, any attempt by a City body or officer to do so, whether by local law or otherwise, would exceed jurisdiction and be contrary to State law. Accordingly, for the Council and Mayor to have enacted a budget condition that compels the CUNY Board to adopt an examination requirement on penalty of losing State-mandated funding violated State law.
Accordingly, it is adjudged that the petition is granted as follows:
(1) the City shall provide no less than $79.4 million to CUNY for its 1999-2000 community college operating budget; and
(2) the provision in the City’s 1999-2000 expense budget that would withhold money appropriated to CUNY unless a *408 prescribed examination requirement is adopted, violates State law to the extent of $79.4 million and the City is hereby permanently enjoined from so enforcing that provision.

. In recent years, the Mayor, City Council, and the CUNY administration and faculty have all worked to improve student performance and raise academic standards at CUNY. The current controversy over requiring an exit examination from remediation programs is related to broad policy considerations: curriculum requirements, measurement of student achievement, and the role of the community colleges within the City University. The advisability of adopting standardized examinations and the related public policy issues are not before this court and are irrelevant to its determination. (See, Matter of Olsson v Board of Higher Educ., 49 NY2d 408, 413 [1980] [recogniz *400 ing judicial reluctance to intervene in controversies involving academic standards].)

. Petitioner denominates her pleading as a “Petition and Complaint.” The claims pleaded and relief sought are embraced by CPLR article 78 and *401 require summary determination. The petition presents solely issues of law; no material factual questions require trial or plenary pretrial treatment. The expedited determination requested by both sides contemplates a special proceeding, not a plenary action.

. Contrary to the City’s argument, petitioner is not seeking a preliminary injunction. Although injunctive relief is being sought, the requested relief is a permanent injunction ancillary to an article 78 proceeding.

. Moreover, it is premature for the City to maintain that petitioner will not be affected by the proposal. The CUNY Board has not yet voted on the proposal, and its terms may be amended to require an examination for students like petitioner.

. A “program of full opportunity” is defined by Education Law § 6304 (1) (a) (i) as one which offers acceptance to all college applicants who reside within New York City and graduated from high school in the prior year or were released from the United States Armed Forces in the prior year, and provides remedial education programs to meet the needs of all the students served by the college. The CUNY “open admissions” program, applicable to the community colleges, apparently satisfies this definition.

. The City emphasizes that CUNY had already embarked on a plan to require a standardized exit examination prior to the City’s enactment. The City misses the point. Whether CUNY previously intended to implement such a requirement is not material. Rather, at issue is whether the City can' make such a requirement a prerequisite to transmittal of appropriated funds.

. It is undisputed that, given current enrollment, the City’s minimum required share would not be less under the alternative per capita, full-time student contribution formula permitted under the Maintenance of Effort Law.